IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DERRICK ROYSTER,                )
                                )
             Plaintiff,          )
                                )        CIVIL ACTION NO. 07-228E
      v.                         )
                                )        MAGISTRATE JUDGE BAXTER
UNITED STATES OF AMERICA,        )
                                )        *(Electronic Filing)*
             Defendant.          )

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

AND NOW comes Defendant, United States of America, through its
counsel, Mary Beth Buchanan, United States Attorney for the Western
District of Pennsylvania, and Michael C. Colville, Assistant United
States Attorney for said district, and, pursuant to Rule 56 of the
Federal Rules of Civil Procedure, respectfully moves the Court to
dismiss Plaintiff's complaint.

I.   **PROCEDURAL BACKGROUND**:

Plaintiff is Derrick Royster, Register Number 03467-007, a
federal inmate who is currently incarcerated at the Federal
Correctional Institution (FCI), Glenville, West Virginia.   On
September 27, 2000, he was sentenced in the District of Columbia
Superior Court to a 10 year, 180 day sentence for Theft and
Aggravated Assault, In violation of DC Code §§ 22-3812(b) and
504.1(b).   Also on September 27, 2000, he was sentenced in the
Superior Court of the District of Columbia to a consecutive 18
month sentence for Attempted Robbery, in violation of DC Code § 22-
2902.   His projected satisfaction date is February 19, 2012, via

mandatory parole.  **See, Affidavit of Rosalind Bingham, Document 1, and Public Information Data of Derrick Royster, Document 1a.**

On February 14, 2003, Plaintiff was transferred to FCI McKean. **See Document 1a, p.1.**  While incarcerated at FCI McKean he tested positive for methicillin resistant staphylococcus aureus (MRSA). Plaintiff claims that his MRSA worsened and did not clear up until November 2006.

The Bureau of Prisons' regulations applicable to administrative tort claims asserted under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. (FTCA), require claims to be submitted first to the Regional Office in the region where the basis for the claim occurred." 28 C.F.R. § 543.31(c).  FCI McKean is a facility within the Northeast Region of the Bureau of Prisons. 28 C.F.R. § 503.2(a)(5).  Thus, any administrative tort claim arising out of the conditions at FCI McKean would be processed by the Northeast Regional Office of the Federal Bureau of Prisons. See 28 C.F.R. § 543.31.  Under the applicable regulations, if a claimant is dissatisfied with the final agency action, he/she may file suit in an appropriate U.S. District Court.  28 C.F.R. § 543.32(g).

A review of the Administrative Tort Claim records indicates that on May 4, 2007, Plaintiff filed an administrative tort claim alleging that he was subjected to MRSA at FCI McKean. Specifically, Plaintiff claimed that he was denied adequate medical

2

attention and treatment.  He also alleged that FCI McKean's Safety Department failed to address and contain MRSA in the inmate housing units.  As relief, he requested $100,000.00 for personal injuries.  **See**, **Administrative Tort Claim - Form 95, Document 1b.**

On May 25, 2007, Plaintiff was advised that his administrative tort claim was rejected, because it was not filed within two years of the date of his alleged injury.  **See**, **Denial Letter, Document 1c.**  However, on August 23, 2007, Plaintiff filed a federal complaint at civil action number 07-228E.  He then filed an amended federal complaint on October 24, 2007.   In both complaints, Plaintiff alleged that FCI McKean denied him reasonable medical care and was deliberately indifferent to his medical needs. Plaintiff also alleged that Defendant failed to provide a safe environment when they removed laundry machines from the housing units.  **See**, **Plaintiff's Complaint and Amended Complaint, Civil Action No. 07-228E.**  As relief, Plaintiff claimed $1,000,000.00 in nominal damages, attorney's fees and court costs.[1]

Defendant initially filed a Memorandum of Law in Support of its Motion to Dismiss or in the alternative, Motion for Summary Judgment wherein it argued that Plaintiff's claims concerning the removal of laundry machines should be dismissed on the basis that

---

[1]   Plaintiff is precluded from claiming damages in excess of the $100,000.00 sum certain amount that was asserted in his Administrative Tort Claim, Form 95 pursuant to 28 U.S.C. 2675(b). **See**, **Document 1b.**

it was untimely filed.  In his Opposition Brief, Plaintiff stated:

> **"In this Complaint Plaintiff is not suing about soap
> breaking up, or anything concerning washing machines.
> This is a suit about the denial of Medical Treatment and
> Medical care, which was due to the Plaintiff in this
> case, that was denied by defendant(s)** ...... Plaintiff
> was denied Medical Care, and Treatment and it was denied
> in Violation of the Eight Amendment to the U.S.
> Constitution with a deliberate indifference to
> Plaintiff's serious Medical needs.  This case is about
> Medical Treatment "Denials", by Defendant's who had an
> obligation to provide Plaintiff with Medical Care, while
> under their care, custody and control." (Emphsis added).

On, January 5, 2009, United States District Judge, Sean J.
McLaughlin denied Defendant's dispositive motion and found that "on
the present record there is an issue of fact as to when Plaintiff
knew or reasonable should have known that the <u>cause</u> of the MRSA
infection was the removal of the laundry machines."  Following
limited discovery on the timeliness issue, the instant motion is
presented.

## II.  <u>FACTUAL BACKGROUND</u>:

### A.  <u>Plaintiff's Medical Records</u>

Laboratory testing conducted by LabCorp, confirmed that
Plaintiff was positive for having the MRSA virus on two separate
occasions.  The first positive result was confirmed in on April 27,
2005, and the second on November 6, 2005.  **<u>See</u>, Declaration of Mack
Bonner, M.D., Document 2, ¶¶ 3c and 3h. <u>See also</u>, Royster Medical
Records, Document 3, pp. 154,155.**

The following is a summary of inmate Royster's relevant medical records[2] related to the diagnosis and treatment of his MRSA infections:

– April 23, 2005, Plaintiff stated he had a spider bite on his right shoulder/upper.  He stated that he first observed it approximately one day prior to reporting it.  Upon examination, there was a palpable abscess on his right upper arm/shoulder, approximately two inches across.  Redness and swelling were present with palpation the abscess opened with puss and blood discharging from the wound.  A culture was taken of the discharge by the medical staff.  It was noted the abscess had an open focus on its center.  The remaining puss was removed with a cotton swab and he was assessed with an abscess.  Bacitracin (brand name Neosporin or Mycitracin, an antibiotic) was applied to the wound and he was bandaged.  Plaintiff was advised to keep the area clean and dry. A verbal order was also issued from the Medical Officer to prescribe Cephalexin 500 mg (brand name: Keflex, an antibiotic) one capsule, four times per day.  A follow-up with the Physician's Assistant (PA) was scheduled for April 25, 2005.  **Document 2, at ¶ 3a; Document 3, at p. 63.**

---

[2]   Defendant has attached only those portions of the Plaintiff's medical records that are relevant to the claims raised by Plaintiff.  However, the entire medical record has been provided to Plaintiff should he wish to rebut any portion of Defendant's assertions with the medical record.

- April 25, 2005, Plaintiff's wound was re-checked.  Plaintiff reported he had no pain and the wound was draining.  The area was again cleaned and bandaged.  Another follow-up was scheduled  for the following Tuesday and Thursday. **Document 2, at ¶ 3b; Document 3, at p. 63.**

- April 29, 2005, the LabCorp report was received indicating that Plaintiff's wound tested positive for MRSA. **Document 2, at ¶ 3c; Document 3, at p. 154.**

- May 2, 2005, Plaintiff's abscess was re-checked by the medical staff and Plaintiff was informed about the positive LabCorp report.  In this regard, Plaintiff signed a Health Report Form that indicated that he and Physician's Assistant, Eric Asp discussed the MRSA situation and the lab results. **Document 3, at pp. 60, 295-296.** Upon examination, the affected area of Plaintiff's right shoulder was crusted as the abscesses were resolving with no exudate and no erythema being observed.  Plaintiff was instructed to follow-up as needed and was prescribed a 14 day supply of Sulfamethoxazole-Trimethoprim (also known as Bactrim, a synthetic antibacterial combination medication), and a 14 day supply of Rifampin (a semisynthetic antibiotic). **Document 2, at ¶ 3d; Document 3, at pp. 60, 179, 206.**

- July 11, 2005, Plaintiff was seen for emergency triage where he complained of abscesses to both of his buttocks.  Plaintiff reported that there was no pain, but they itched a lot.  On

examination of his buttocks, resolving abscesses of both gluteals were observed. He was assessed with abscesses and was not diagnosed with MRSA at this time. Plaintiff was educated regarding abscess care, medication use, and side effects. He was prescribed Keflex, and told to return as needed. **Document 2, at ¶ 3e; Document 3, at pp. 55, 206.**

- August 15, 2005, Plaintiff complained of an abscess on his buttocks and groin area. The abscesses were not draining. He reported they were hard and painful, with the pain at a level of eight on a scale of one to ten. He reported the abscesses on his buttocks were hard and ready to drain. He also reported a few new bumps were developing on his thighs and groin. On examination, his buttocks indicated firm, red tender bumps with no discharge. An examination of his groin indicated tender, domed nodules without discharge. He was assessed with furundes and was not diagnosed as having MRSA at this time. He was educated to apply hot/warm compresses 2-3 times each day and was prescribed a 10 day supply of Sulfamethoxazole/Trimethoprim (Bactrim DS) and Tylenol (Acetaminophen). He was told to return as needed. **Document 2, at ¶ 3f; Document 3, at pp. 50-51, 206.**

- November 3, 2005, Plaintiff reported a "spider bite" at the top of his head and right thigh. On examination of the anterior thigh, large firm abscesses with some dry crusting on top were noted. On top of his head, the abscess was crusted, firm, with

7

tenderness and erythema.  He was assessed with infected wounds to the right thigh and top of head.  He was prescribed a 14 day supply of Sulfamethoxazole/Trimethoprim (Bactrim, a synthetic anti-bacterial combination medication) and Bacitracin/Zinc ointment (antibacterial topical medication).  A wound culture was taken and sent to LabCorp.  **Document 2, at ¶ 3g; Document 3 at  pp. 46-47, 155, 206.**

    - November 8, 2005, it was noted that Plaintiff's wound culture that was collected on November 3, 2005, tested positive for MRSA.  It was noted he needed to start Bactrim.  **Document 2, at ¶ 3h; Document 3, at pp. 42, 155.**

    - November 11, 2005, Plaintiff was seen for a re-check of the abscesses at the top of his head and right thigh.  On examination, it was noted the abscesses had reduced in size.  They were drying and healing well. He was assessed with abscesses - MRSA, resolving. He was told to finish the Bactrim and to return if he experienced problems.  **Document 2, at ¶ 3i; Document 3, at p. 42.**

    - June 14, 2006, Plaintiff was seen in the chronic care clinic.  He complained of sores on his left leg.  On examination of his left lower leg, two areas of abscesses were noted.  He was assessed with depression without medications, hypertension and GERD.  He was prescribed a 14 day supply of Bactrim, Zantac and Lisinopril (a medication used to treat high blood pressure).  Plaintiff was not diagnosed as having MRSA at this time. **Document**

**2, at ¶ 3j; Document 3, at pp. 32-33, 207.**

- September 14, 2006, Plaintiff complained of chronic abscesses on his thighs.  He stated he had these for over two weeks.  On examination, a large abscess was observed on his left thigh.  Dried crusted areas noted.  He was assessed with abscess left thigh recurrent, probably secondary to interigo (inflammation of the top layers of skin due to moisture, bacteria, yeast, or fungus in the folds of the skin) and obesity.  He was prescribed a 14-day supply of Keflex (Cephalexin)and Bacitracin Zinc ointment. Plaintiff was not diagnosed as hiving MRSA at this time.  **Document 2, at ¶ 3k; Document 3, at pp. 30-31, 207.**

### B.   Town Hall Meetings -- MRSA Education

In February of 2004, the first case of MRSA was diagnosed and reported at FCI McKean.  **See, MRSA Case Tracking Reporting Form (redacted), Document 4.**  Between February 2004 and February 2005, there were twenty-two (22) cases of MRSA reported at FCI McKean. **Document 4.**  As a result of the MRSA outbreak, a decision was made by Health Services Administrator, Rodney S. Smith, to hold town hall meetings to help educate the inmate population about the MRSA outbreak and to advise the inmates on what precautions should be taken to prevent further spread of the virus.  **See, Affidavit of Rodney S. Smith, Document 5.**  Between February 2004 and April 2005, Mr. Smith conducted town hall meetings in each of the eight (8) housing units at FCI McKean.  **Document 5, ¶ 4-5.**

9

At the town hall meetings, inmates were introduced to Brian Douthit, EMT-P, the Infectious Disease Coordinator at FCI McKean. The etiology of the MRSA virus was explained and inmates were provided with facts and information as to how the virus could be controlled and/or how to defend against exposure to the virus, including the use of antibiotics. **Document 5, Exhibit A.**   In addition to the town hall meetings, Mr. Smith posted a MRSA Fact Sheets in each of the housing units at FCI McKean for the inmates to review.   The fact sheets provided additional information concerning the MRSA virus. **Document 5, Exhibit B.**

C.   <u>**Washing Machined Removed**</u>

On January 18, 2005, a no tobacco policy went into effect at FCI McKean. **<u>See</u> Affidavit of James F. Sherman, Document 6 at ¶ 4.** On February 10, 2005, a food strike occurred at FCI McKean, and the institution was placed on lock down status. **Document 6, at ¶ 6.** The institution lockdown lasted from February 10, 2005, through February 17, 2005, and from February 22, 2005, through March 28, 2005. Both lockdowns were instituted due to an inmate food strike. **Document 6, ¶ 7.**

After an investigation, it was determined the food strikes were called by inmates in protest of the no-tobacco policy that went into effect at all Bureau of Prisons across the country, including FCI McKean on or about January 18, 2005.   It was also learned that the inmates at FCI McKean were also organizing to

10

protest new institution operating procedures that were scheduled to go into effect on March 22, 2005. **Document 6, at ¶ 7.**

During the institution lockdown in February 2005, the Executive Staff at FCI McKean directed that the laundry machines be removed from the inmate housing units. In addition to laundry machines, weights and pool tables were removed. The items removed from the inmate housing units were considered privileges, and were not required under any statute, regulation or rule to be available in inmate housing units. The decision as to whether to furnish the housing units with these items was a decision left to the discretion of each Bureau of Prisons institution that took into consideration numerous factors, including the health and safety of the inmates, the necessity of these items with respect to prison safety, sanitation and security the ability of inmates to maintain an adequate supply of clean clothing though the prison laundry service, general concerns for prison security, and the effective use of limited resource. When determining whether these items should be removed, the executive staff noted these items were considered privileges, and were not required in the inmate housing units under any statute, regulation or rule. These items were removed after notice to the inmate population that the disruptive and/or destructive activities conducted by the inmates in response to the implementation of the new tobacco policy would not be tolerated, and the continued participation in such activities would

result in the loss of these privileges.  **Document 6, at ¶ 8.**

During the lockdown, inmates were instructed that all laundry would be done by the institution's laundry services.  A laundry schedule and procedures were prepared, and inmates were informed of the new procedures.  During the lockdown the regular laundry schedule was modified so inmate laundry could be picked up from the Unit and clean laundry would be returned to the unit the following morning.  **Document 6, at ¶ 9.**

Inmates were not authorized to handwash their laundry in the housing units or air dry their clothes in the housing units on handrails.  **Document 6, at ¶ 10.**  The decision to remove the washing machines and dryers was made because Executive Staff at FCI McKean wanted to provide incentives for inmates to cease or refuse to participate in disruptive and destructive conduct.  Also, there was concern that inmates were using bar soap in the unit washing machines, which was caused washing machine breakdowns, plumbing issues and necessitating repairs.  Another safety/security factor related to the unit laundry facilities was the possibility of inmates providing laundry services for other inmates for payment. It was believed that by removing the laundry facilities from the housing units, FCI McKean could decrease costs and improve security.  **Document 6, at ¶ 11.**

It was believed that the removal of laundry facilities from the inmate housing unit would not place the inmates in an unsafe,

or unsanitary environment. **Document 6, at ¶ 12.** Information disseminated by the Center for Disease Control, Community-Associated MRSA Information for the Public indicates that in the outbreaks of MRSA, the environment has not played a significant role in the transmission of MRSA. In this regard, MRSA is transmitted most frequently by direct skin-to-skin contact. Individuals can protect themselves from infections by practicing good hygiene (washing with soap and water) and most MRSA infections are treatable with antibiotics. **Document 1f, at p. 3.** Moreover, under Bureau of Prisons Program Statement 4200.10, <u>Facilities Operations Manual</u>, Bureau of Prisons institutions were required to ensure that the final rinse cycle water temperature of 160 degrees Fahrenheit for laundry operations. **<u>See</u>, Program Statement 4200.10, at Chapt. 6, p. 6, attached to the Declaration of Rosalind Bingham, Document, Document 1d.** There is no credible evidence that the laundry water temperatures failed to meet this requirement. <u>See</u> **Document 6, at ¶ 12.**

III. <u>**ARGUMENT**</u>:

    A. <u>**Standard for Summary Judgment**</u>

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered "forthwith" if there is no genuine issue as to any "material fact." In recent years there has been a dramatic change and much greater willingness of the courts to grant this remedy. In 1986 the Supreme Court decided three cases which

13

greatly liberalized summary judgment practice and encouraged a much greater use of summary judgment by trial courts. <u>See</u> <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986); <u>Anderson v. Liberty Lobby, Inc.</u> 477 U.S. 242 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).

As stated by Chief Justice Rehnquist, summary judgment now:

> is properly regarded not as a disfavored procedural shortcut but rather as an integral part of the Federal Rules as a whole... Rule 56 must be construed with due regard not only for the rights of person asserting claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

<u>Celotex</u>, 477 U.S. at 327. "Modern, post-trilogy summary judgment doctrine is a stronger and more aggressive approach to summary judgment practice that places a reduced burden on the movant, greater burdens on the non-movant, and makes summary judgment more likely to be granted than the pre-trilogy approach." Moore's Fed. Prac., vol. 11, p. 56-312.1.

One of the essential purposes of the motion is to "isolate and dispose of factually unsupported claims or defenses." <u>Celotex</u>, 477 U.S. at 323-324. The defendants have the initial burden of showing that there is an absence of evidence to support an essential element of the plaintiff's case; and then the plaintiff has the burden to come forward with "specific facts" showing that there is a genuine issue for trial. <u>LaBounty v. Coughlin</u>, 137 F.3d 68, 73 (2nd Cir. 1998). The failure to sufficiently support all elements

14

necessary to support a case will render all other facts immaterial. Celotex, 477 U.S. at 323; Moore's Fed. Prac., vol. 11, p. 56-143.

The fact that a plaintiff has some facts on his side, or that there are some factual disputes, is not enough to deny the motion. The "mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; Matsushita Elec. Indus. Co., 475 U.S. at 586 (The motion will not be denied merely because of "some metaphysical doubt" about the material facts); Davidson v. Scully, 114 F.3d 12, 14 (2nd Cir. 1997)(The existence of "some" alleged factual dispute is not enough to defeat summary judgment, the opponent must show that there is no "genuine" issue of material fact"); Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2nd Cir. 1996)(Mere "conclusory allegations, speculation or conjecture" also will not defeat the motion); Sunshine Books Ltd. v. Temple University, 697 F.2d 90 (3d Cir. 1982)(The responding party may not rest on the allegations of his/her pleading but must present by affidavit or otherwise specific facts sufficient to create a genuine issue of material fact.  Fed.R.Civ.P. 56(e)).

### B.   This Civil Action Should Be Dismissed, Because Plaintiff Failed To File A Timely Administrative Tort Claim

This civil action should be dismissed, because Plaintiff failed to file a timely administrative tort claim prior to filing the Complaint in this civil action.  Pursuant to the Federal Tort

Claims Act, 28 U.S.C. §2671, et seq. (FTCA), the United States has consented to being sued in tort under certain limited circumstances. See 28 U.S.C. § 2674; Livera v. First Nat'l State Bank of N.J., 879 F.2d 1186, 1194 (3d Cir.)(FTCA "constitutes a waiver of sovereign immunity..."), cert. denied, Livera v. U.S. Small Bus. Admin., 493 U.S. 937, 110 S.Ct. 332, 107 L.Ed.2d 322 (1989).

The FTCA establishes an administrative remedy procedure, and a claimant "is required to file a claim with the agency allegedly responsible for [his or] her injuries." Reo v. United States Postal Serv., 98 F.3d 73, 75 (3d Cir. 1996). The waiver of sovereign immunity pursuant to the FTCA is conditioned on a plaintiff having exhausted the available administrative remedies. 28 U.S.C. § 2675 provides:

> [a]n action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and set by certified or registered mail.

28 U.S.C. § 2675.

The time for filing an administrative claim under the FTCA is governed by 28 U.S.C. § 2401(b), which provides:

> *A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such*

*claim accrues* or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b)(emphasis added).

The determination of when a claim accrues for the purposes of the FTCA is a question of federal law. Tyminski v. United States, 481 F.2d 257, 262-63 (3d Cir. 1973). The Supreme Court has admonished that the courts should carefully construe the statute of limitations for the FTCA so as not to extend the limited waiver of sovereign immunity beyond that which Congress intended. United States v. Kubrick, 444 U.S. 111, 117-118, 100 S.Ct. 352, 356-57, 62 L.Ed.2d 259 (1979).

In Hughes v. United States, 263 F.3d 272 (3d Cir. 2001), the Third Circuit explained:

> ...the injury is not the mere undetected existence of the medical problem at the time the physician failed to diagnose or treat the patient or the mere continuance of that same undiagnosed problem in substantially the same state. Rather, the injury is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment. In this type of case, it is only when the patient becomes aware of through the exercise of reasonable diligence should have become aware of the development of a pre-existing problem into a more serious condition that his cause of action can be said to have accrued for purposes of section 2401(b).

Hughes, 263 F.3d at 275; see also Augustine v. United States, 704 F.2d 1074, 1078 (9th Cir. 1983); Green v. United States, 180 Fed. Appx. 310, 315, 16 (3d Cir. 2006). The determination of the time at this a claim accrues within the meaning of § 2401(b) involves an

17

objective inquiry; asking not what the plaintiff knew, but what a reasonable person should have known.  Barren by Barren v. United States, 839 F.2d 987, 991 (3d Cir. 1988); Green, 180 Fed. Appx. at 313.

Defendant now finds itself in the unique position of identifying the date Plaintiff knew or should have known the cause of an injury, where there is no clear evidence indicating that his injury (MRSA) was "caused" by any act or omission of BOP personnel. Although Defendant denies that an injury occurred as a result of an indifference to Plaintiff's medical needs, or as a result of having laundry machines removed from the housing units in February 2005, the question to be answered for purposes of this argument nevertheless remains - when  did Plaintiff know or when should he have known the cause of his MRSA infection?

In this case, Defendant contends that Plaintiff's claim accrued sometime between April 23, 2005 when he became aware of his injury and May 2, 2005 when he and Physician's Assistant, Eric Asp discussed the positive MRSA lab result and his treatment plan.  At points prior to and during this time period, Plaintiff had access to the following information about MRSA:

- Between February 2004 and April 2005, eight (8) town hall meetings were conducted by Health Services Administrator, Rodney S. Smith in each of FCI McKean's housing units.  Inmates were informed of the MRSA outbreak and educated about what precautions should be

taken to prevent further exposures.  **Document 5.**

- Between February 2004 and April 2005, MRSA Fact Sheets were posted in each of the housing units at FCI McKean.

- On April 23, 2005, Plaintiff was examined by Brian Douthit, EMT-P, Infectious Disease Coordinator concerning a "spider bite"/abscess.  During this visit, Plaintiff's abscess was cleaned, a culture was taken, the wound was bandaged and he was prescribed antibiotic medications.  Plaintiff was instructed to keep the wound clean and a followup was scheduled.  **Document 3, p. 63.**

- April 25, 2005, Plaintiff's wound was re-checked by Brian Douthit.  The wound was again cleaned and bandaged and another followup visit was scheduled.  **Document 3, p. 63.**

- On April 29, 2005, a LabCorp report was received and reviewed by Dr. Olson, M.D.  The report indicated that Plaintiff was positive for MRSA.  **Document 3, p. 154.**

- On May 2, 2005, Plaintiff's abscess was again re-checked and Plaintiff was advised of the positive MRSA lab result and prescribed antibiotic medications.  Progress Notes indicate that Plaintiff was educated about MRSA and that he understood.  **Document 3, p. 60.**  Medical records further reflect that Plaintiff acknowledged in writing that he and Physician's Assistant, Eric Asp discussed the MRSA situation and lab results. **Document 3, p.294-95.**

- Plaintiff was not once denied medical treatment and the medical record demonstrates that he received medical attention and

treatment for each and every complaint that he presented to the medical staff at FCI McKean. **Document 3.**

- Plaintiff has not plead nor has he offered credible evidence to suggest that Defendant actively mislead him about the cause of his MRSA infections. In this regard, plaintiff has simply failed to plead specific facts to show that Defendant was aware of a danger and concealed it or otherwise utilized deceitful measures to hide facts from him as is required by F.R.C.P. 9(b).

- At all times material hereto, Plaintiff had access to medical journals, and treatises concerning the diagnosis and treatment of MRSA as is evidenced by the numerous exhibits attached to his Opposition Brief.

- At all times material hereto, Plaintiff was free to seek or to consult with outside experts or credible witnesses concerning his symptoms, treatments and alleged exposures to MRSA. He has not done so and he does not have an expert. **Document 7, pp. 14-15.** Moreover, Plaintiff's medical records do not indicate that he questioned his own health care providers at FCI McKean about the cause and/or treatment of his MRSA. **Document 3.**

Plaintiff presented his Federal Tort Claim to the Bureau of Prisons on May 4, 2007.[3] **Documents 1b, 1c.** Given the facts and

---

[3] Department of Justice regulations governing Administrative Tort Claims, specify that an administrative tort claim is "presented" "when a Federal agency receives from a claimant, his duly authorized agent or legal representative, and executed Standard Form 95 or other written notification of an incident..."

information known to Plaintiff, or available to Plaintiff, he knew or should have known the cause of his MRSA more than two (2) years prior to the filing of is administrative tort claim on May 4, 2007. Plaintiff's failure to investigate promptly and to file an administrative claim within two years of the accrual of his cause of action renders his claim untimely.

### C. Plaintiff's Claim Regarding The Removal Of The Laundry Machines Should Be Dismissed Pursuant To The Discretionary Function Exception To The Federal Tort Claims Act, 28 U.S.C. § 2680(a)

Plaintiff contends that as a result of the removal of laundry machines in the housing units, he opted to hand wash his clothes in buckets and air-dry them on hand rails along the stairs. He argues that this practice of hand washing and air-drying caused him to contract MRSA. Because the placement of washing machines and dryers at FCI McKean during the time that is subject to this lawsuit was (and remains) a discretionary matter, this case falls within the discretionary function exception to the limited waiver of sovereign immunity. 28 U.S.C. § 2680(a). As such, it should be dismissed for lack of subject matter jurisdiction.

The FTCA waives the federal government's sovereign immunity in suits involving "personal injury...caused by the negligent or wrongful act or omission of any employee of the Government ...

───────────────

28 C.F.R. § 1402(a); see, Lang v. United States, 2002 WL 31573046, No. Civ. 2000-100 M/B.(D.Virgin Islands, April 11, 2002); Harris v. United States, 1994 WL 698015, Civ. A. No. 94-CV-2784 (E.D.Pa. Dec. 9, 1994).

under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346 (b)(1).  This waiver of sovereign immunity, however, is subject to a number of statutory exceptions, including the "discretionary function exception."  See 28 U.S.C. § 2680(a).  28 U.S.C. § 2680(a) provides:

> The provisions of this chapter and section 1346(b) of this title shall not apply to -
>
> > a.  Any claim based upon an act or omission of an employee of the Government exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. Section 2680(a).

The purpose of the exception is to shield administrative decisions involving an element of judgment from judicial second-guessing.  United States v. Gaubert, 113 L. Ed. 2d 335, 346-48 (1991); Berkovitz v. United States, supra; United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 104 S. Ct. 2755, 81 L. Ed. 2d 660 (1984).

To determine whether a government employee's conduct is protected under the discretionary function exception, a court must apply a two prong test, commonly referred to as the Berkovitz-

Gaubert test.  See United States v. Gaubert, 499 U.S. 315 (1991);
Berkovitz v. United States, 486 U.S. 531 (1988).  Under this test,
a court must first determine whether the challenged action involved
an element of judgment or choice.  See Gaubert, 499 U.S. at 328.
This includes "day-to-day" management decisions.  Fazi v. United
States, 935 F.2d 535, 538 (2d Cir. 1991)(citing Gaubert, 499 U.S.
at 328).  Where an act is specifically mandated by statute or
regulation and does not provide for any employee discretion, the
challenged act is not entitled to immunity.  See Fazi, 935 F.2d at
538 (citing Berkovitz, 486 U.S. 536).

If the challenged act satisfies the first requirement, a court
must then determine whether the employee's judgment was "based on
considerations of public policy."  Gaubert, 499 U.S. at 323
(quoting Berkovitz, 486 U.S. at 537).  If a regulation gives an
employee discretion, "the very existence of the regulation creates
a strong presumption that a discretionary act authorized by the
regulation" is inextricably intertwined with the policy
considerations which lead to the creation of the regulation.  Id.
at 324.  Thus, "it must be presumed that the agent's acts are
grounded in policy when exercising that discretion."

The design and operation of a federal prison involves a wide
range of social and economic considerations.  Social concerns and
considerations for a prison are markedly different from concerns in
operating any other organization.  Jones v. North Carolina

Prisoners' Labor Union, Inc., 433 U.S. 119, 129 (1977).   The
Supreme Court has repeatedly noted broad deference is to be
afforded to the discretion exercised by prison administrators in
adopting and executing policies and practices which address the
day-to-day problems in operating a corrections facility.   E.g.,
Thornburgh v. Abbott, 109 S.Ct. 1874, 1879 (1989); Turner v.
Safley, 107 S.Ct. 2254, 2259 (1987); Bell v. Wolfish, 441 U.S. 520,
547 91979); Pell v. Procunier, 417 U.S. 817, 827 (1974).   These
decisions necessarily involve balancing limited prison resources
with the overriding concern of institution security.   Turner v
Safley, 107 S.Ct. at 2262.

The duty of care owed by the Bureau of Prisons to the inmate
population is set forth at 18 U.S.C. § 4042.   18 U.S.C. § 4042
(a)(2)-(3) states, in pertinent part, the BOP must provide
"suitable quarters and provide for the safekeeping, care, and
subsistence of all [federal inmates]."   "While it is true that the
statute sets forth a mandatory duty of care, it does not, however,
direct the manner by which the BOP must fulfill this duty.   The
statute sets forth no particular conduct the BOP personnel should
engage in or avoid while attempting to fulfill their duty to
protect inmates." Calderon v. United States, 123 F.3d 947, 950 (7th
Cir. 1997).   The statute assesses only the general responsibilities
of BOP employees to ensure the safekeeping, care, and protection of
inmates.   The absence of specific guidelines of appropriate conduct

by BOP officials in administering these duties, therefore, leaves judgment or choice to BOP officials.

With respect to the placement of laundry facilities in inmate housing units, there is no statute, regulation, policy or rule which mandates the placement of washing machines and clothes dryers in inmate housing units.  The American Correctional Association (ACA) issued minimum standards correctional institutions must follow.  With respect to Laundry Services, there is no requirement that prisons provide laundry facilities in inmate housing units, the ACA standards provide:

> Inmates are provided the opportunity to have three complete sets of clean clothing per week.  The facility may provide this clean clothing in several ways, including access to self-serve washer facilities, central clothing exchange, or a combination of the two.  Wash basins in cells or rooms are not compliant.

**Document 1e**, ACA Standard 4-4338, attached to the Declaration of Rosalind Bingham.

Under Institution Supplement MCK 4810.1b, <u>Laundry and Clothing Issue Procedures</u>, inmates at FCI McKean are issued a complete set of clothing, including undershorts, t-shirts, socks, trousers, shirts, safety-toed boots, gloves, winter cap, seasonal jacket, belt/buckle, towels, washcloth, blanket and laundry bag.  **See Institution Supplement MCK 4810.1b, <u>Laundry and Clothing Issue Procedures</u> attached to the Declaration of Monica Recktenwald, Document 8, at p. 2.**  Institution policy permits inmates to

exchange clothing, bed linens, and towels. **Document 8, at p. 3.** Also, the Institution Supplement sets forth laundering procedures, which direct inmates to drop off their laundry daily. **Document 8, at pp. 3-4.**

The laundry facilities in inmate housing units was intended as a supplemental means by which inmates could lauder their clothes, and was not intended to serve as the only means by which inmates were to maintain a clean supply of clothing, linens and towels. **Document 6, ¶ 9.** The laundry facilities in the inmate housing units were viewed as privileges or benefits for the inmates, similar to televisions, exercise machines and pool tables. **Document 6, at ¶ 8.** The decision to remove the laundry facilities in February 2005, was the institution's response to a food strike that had been planned by inmates in protest to the 2005 nationwide tobacco policy which prohibited inmates from possessing or using tobacco products at Bureau of Prisons facilities. **Document 6, at ¶ 7.** The removal of the laundry machines from the inmate housing units was also based upon the institution's concern that the machines and plumbing were frequently damaged due to the inmates' use of bar soap in the washing machines. **Document 6, at ¶ 11.** Also, there was a concern that some inmates were conducting clothes laundering "businesses" by washing the clothing of other inmates for a price. **Document 6, at ¶ 11.**

Prior to the removal of the housing unit laundry facilities, FCI McKean was placed on lockdown status as a means of restoring order and safety to the institution.  All inmates were advised that the disruptive response to the tobacco policy and proposed changes in institution procedures would not be permitted, and the refusal to curtail the disruptive behavior after the institution lockdown was initiated would result in the loss of certain privileges including weights, pool tables, and unit laundry facilities. **Document 6, at ¶ 8.**

The decision to remove the housing unit laundry facilities was made after consideration of numerous factors, including the health and safety of the inmates, the necessity of these items with respect to prison safety, sanitation and security, the ability of inmates to maintain an adequate supply of clean clothes through the prison laundry service, general concerns for prison security and the effective use of limited resources. **Document 6, at ¶ 8.**  The removal of the laundry facilities did not deprive inmates of the institution laundry services, because laundry services were available to all inmates through the institution laundry. **Document 6, at ¶ 9.**  During the lockdown, inmate laundry bags were picked up from the housing units, and returned the following morning after laundering. **Document 6, at ¶ 9.**  Thus, removal of the laundry facilities from the inmate housing units was a measure taken by the institution, whose interest in restoring order and safety to the

27

institution outweighed the inmates' need for laundry facilities in the housing units. **Document 6, at ¶ 11.** Inmates were not directed to handwash their clothing in buckets or to dry their clothes on handrails. **Document 6, at ¶ 10.**

Plaintiff can cite to no statutes, regulations or BOP policies that removed the discretion from prison personnel the authority to determine whether to supplement the institution laundry service or the where within the institution any additional laundry facilities should be located. "Because the purpose of this exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy .., the exception protects only governmental actions and decisions based on considerations of public policy. Id., at 323; see also Maas v. United States, 94 F.3d 291, 296 (7th Cir. 1996); Rothrock v. United States, 62 F.3d 196, 198 (7th Cir. 1995).

In Gaubert, supra, the Supreme Court explained that there is a presumption that the actions of government employees are grounded in public policy in cases where the statute or regulations allow the government agent to exercise discretion:

> [f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.

Id., at 324-25.

Here, the Executive Staff of FCI McKean exercised its

28

discretion when determining to remove laundry facilities from the inmate housing units.  This determination involved public policy considerations and balancing the interests of staff and inmates with the need for hygiene, safety and sanitation.  **Document 6.**  The regulations and policy gave FCI McKean flexibility to determine whether supplemental laundry facilities should be provided as well as the discretion to determine where to place those supplemental laundry facilities, if appropriate.

The determination of FCI McKean to remove the laundry facilities from the inmate housing units was an effort to dissuade the inmates from continuing to participate in disruptive conduct. It was FCI McKean's determination that even without laundry facilities in the housing units, the institution laundry was adequate to meet the laundry needs of the inmates.  **Document 6.** This determination was not contrary to either Bureau regulations or to the Institution Supplements.  That Plaintiff may disagree with this determination does not remove the discretionary character or remove the public policy interests from these issues.

Once a particular function is found to be discretionary, a negligence claim will fail, even if the Bureau of Prisons abused its discretion or was negligent in the performance of its discretionary functions. <u>Bailor v. Salvation Army</u>, 51 F.3d at 685. See <u>Dykstra v. United States Bureau of Prisons</u>, 140 F.3d 791, 795-97 (8th Cir. 1998) (no claim under the FTCA for BOP's alleged

29

negligence in failing to protect an inmate from assault by another inmate because decisions whether to place an inmate in protective custody is the exercise of a discretionary function); <u>Calderon v. United States</u>, 123 F.3d 947, 949-51 (7th Cir. 1997)(no claim under the FTCA based on the BOP's alleged negligence in failing to protect an inmate from attack by another inmate because decision whether to take disciplinary action against other inmate was the exercise of a discretionary function); <u>Bailor</u>, 51 F.3d at 685 (no claim under the FTCA for negligent placement and supervision of inmate where inmate was placed in a halfway house, but later fled from the halfway house, and assaulted/raped a civilian); <u>Hylin v. United States</u>, 755 F.2d 551, 553 (7th Cir. 1985)(discretionary function exception barred negligence claim against federal mine inspectors after death of mineworker from electrocution who came into contact with defective electrical device located in a mine, because enforcement activities of the Mine Enforcement and Safety Administration are protected by discretional function exception to FTCA liability).

   **D.   Plaintiff's Claim Based Upon Alleged Inadequate Medical Care Should Be Dismissed Because He Cannot Establish A Prima Facie Case Of Medical Malpractice**

This case was brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671.  The Federal Tort Claims Act allows private individuals to bring suits against the United States for torts committed by its employees acting within the scope of their

employment.  <u>See</u> <u>Bialowas v. United States</u>, 443 F.2d 1047 (3d Cir. 1971).  Pursuant to the FTCA, the United States may be held liable "in the same manner and to the same extent as a private individual under like circumstances..." 28 U.S.C. § 2674.  The liability of the United States is determined by the law of the state where the tortious conduct occurred.  <u>United States v. Muniz</u>, 374 U.S. 150, 152 (1963), (citing 28 U.S.C. §1364(b)).  Consequently, in this case the United State's liability will be determined by the laws of negligence and medical malpractice in Pennsylvania.

Under Pennsylvania law, a plaintiff in a medical malpractice case must first establish a <u>prima</u> <u>facie</u> case of malpractice.  To accomplish this, the plaintiff must produce evidence that establishes (1) the applicable standard of medical care accepted by the medical community, (2) that the care provided to the plaintiff deviated and fell below the standard of care, and (3) that the injury complained of resulted from that failure.  <u>Titchnell v. United States</u>, 681 F.2d 165, 166 (3d Cir. 1982).

Pennsylvania law requires the Plaintiff to produce expert testimony that shows the physician's conduct at issue, varied from accepted medical practice.  Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of lay persons, [a]llegations of medical malpractice generally may <u>not</u> be proven without the testimony of "an expert witness who will testify, to a reasonable degree of medical

31

certainty, that the act of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." See Gindraw v. Dendler, 967 F.Supp 833 (E.D.Pa. 1997) (quoting, Mitzelfelt v. Kamrin, 526 Pa. 54,62, 584 A.2d 888, 892 (1990). A very narrow exception to the requirement of expert testimony in medical malpractice actions applies only where "the matter is so simple, or the lack of skill or care so obvious, as to be within the range of experience and comprehension of even non-professional persons." See Toogood v. Rogal, 2003 WL 21241255 (Pa. 2003)(quoting, Hightower-Warren v. Silk, 548 Pa. 459, 698 A.2d 52, 54 n.1 (1997)); Brannan v. Lankenau Hospital, 490 Pa. 588, 598, 417 A.2d 196, 201 (Pa. 1980). This narrow exception should not apply in this case.

In addition to the requirement of expert testimony on the underlying issue of medical negligence, expert testimony is required to establish a causal connection between the defendant's alleged negligent acts and the plaintiff's injuries. Dornon v. Johnston, 421 Pa. 58, 218 A.2d 808 (1966)(where the factual relationship between the negligent act and injury is sufficiently obscure that laymen are unable to make reasonable determinations as to its existence, expert guidance is needed).

In other words, to prove his claim of medical malpractice, Plaintiff must produce expert testimony that demonstrates to a reasonable degree of medical certainty that the acts alleged

deviated from acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.  See Mitzelfelt, 526 Pa. 54, 584 A.2d 888 (1990).  Failure to meet this burden is a failure to create a genuine issue of material fact as to whether or not his care was adequate.

The issue of whether Plaintiff received adequate medical treatment for his MRSA infections is clearly not so simple as to be within the scope of ordinary experience of nonprofessional persons. To the contrary, expert testimony is crucial to a proper understanding of the issues of negligence and causation in this case.  The Supreme Court of Pennsylvania emphasized in Toogood, "We reaffirm our earlier conclusion, set forth in numerous decisions of the Court that, medicine being an applied science, the realm of reasonable choice is best defined by those engaged in the practice, and expert medical testimony on this issue is required." Toogood, 824 A.2d 1140, 1148.  The Plaintiff must establish both a prima facie case of negligence, and that such negligence was the proximate cause of his injuries.  The only way to meet this burden is through an expert that testifies to a reasonable degree of medical certainty that such is the case.  "The Pennsylvania Supreme Court has expressly held in malpractice cases, a jury will not be permitted to find negligence without expert testimony to establish variance from accepted medical practice."  Tarter v. Linn, 396 Pa.Super. 155, 578 A.2d 453 (1990).

In this case, Plaintiff's testified at his deposition that he has not retained a medical expert, nor has he contacted a medical expert who will provide an expert medical opinion or testimony in support of Plaintiff's claim.  **See**, **Deposition Transcript of Derrick Royster**, **Document 7, p. 14.** If Plaintiff cannot provide expert testimony on the issue his claim should be dismissed.

Respectfully submitted,

MARY BETH BUCHANAN
United States Attorney


/s/ Michael C. Colville
MICHAEL C. COLVILLE
Assistant U.S. Attorney
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7337
PA ID No. 56668

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July, 2009, a true and correct copy of the within MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was served, by either electronic means or by postage paid U.S. Mail, to and upon the following:

Derrick Royster
Reg. No. 03467-007
FCI Gilmer
P.O. Box 6000
Glenville, WV  26351

/s/ Michael C. Colville
MICHAEL C. COLVILLE
Assistant U.S. Attorney